## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

     **v.**                           **Case No. 22-CR-30**

**CHAD M. SCHAMPERS,**
**NATHANIEL R. SMITH,**
**GINA L. SCHAMPERS, and**
**JEFFREY M. O'BRIEN,**

     **Defendants.**

## REPORT AND RECOMMENDATION ON
## DEFENDANTS' MOTIONS TO SUPPRESS

A grand jury sitting in the Eastern District of Wisconsin returned a ten-count indictment against Chad M. Schampers, Nathaniel R. Smith, Gina L. Schampers, and Jeffery M. O'Brien ("defendants"). (Docket # 1.) Defendants are charged with conspiracy to commit wire and bank fraud in Count One of the indictment and with wire fraud in Counts Two through Ten. The defendants have entered pleas of not guilty. This case has been designated as complex, with the final pretrial conference set for April 7, 2023 and a jury trial set for May 8, 2023 before the Honorable William C. Griesbach.

The defendants have filed motions to suppress and request a *Franks* hearing. (Docket # 49, 55, 57, and 62.) The government has responded in opposition. (U.S.'s Consolidated Resp. to Defs.' Motions, Docket # 68.) The motion to suppress is based on a June 26, 2019 federal search warrant to search the premises of Summit Contracting, Inc. ("Summit"), a

home improvement service located in De Pere, Wisconsin that operated from late 2018 through early 2020 and is co-owned by defendants Chad Schampers and Nate Smith.

Defendants argue that the evidence derived from the search should be suppressed because the search warrant lacks probable cause on its face. (Defs.' Mem. in Supp., Docket # 52 at 1–3.) Defendants further argue that the warrant accusing Summit and its principals of bank and wire fraud "fails to allege that Summit, its owners, or its employees deceived customers or financial institutions." (*Id.* at 2.) Further, FBI Special Agent Sarah Deamron's supporting affidavit "fails to allege who committed fraud, how, when, and why" and "relies on two confidential witnesses—neither credible." (*Id.*) Finally, if the Court determines that the warrant was supported by probable cause, then defendants request a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), "to evaluate material omissions about witness credibility in the search warrant affidavit." (*Id.* at 3.)

As an initial matter, the government argues that "each defendant lacks standing to seek suppression of the evidence because ownership or participation in a business alone is not sufficient to establish a reasonable expectation of privacy in the business's office space or records." (U.S.'s Consolidated Resp. to Defs.' Mots., Docket # 68 at 1.) Moreover, it argues that the affidavit described a "straightforward fraud with sufficient detail to provide the magistrate enough evidence to conclude that probable cause existed for a search warrant," and that Agent Deamron, the affiant, "provided all the relevant information she had as it related to the witnesses on whom the affidavit relied." (*Id.* at 2.) Therefore, the government argues, there is "no basis upon which to suppress the evidence and no reason to require a *Franks* hearing." (*Id.*)

For the reasons explained below, I find that defendants Nate Smith and Chad Schampers met their burdens to establish standing to challenge the search of both their respective individual offices and the entirety of the Summit premises and that Gina Schampers met her burden as to her individual office. Additionally, I find that the defendants have made the substantial preliminary showing to warrant a *Franks* hearing.

## BACKGROUND

*1.    The Search Warrant*

On June 25, 2019, the FBI sought and was granted a federal search warrant for Summit's premises located at 1703 West Matthew Drive in De Pere. The warrant was based on the affidavit of FBI Special Agent Sarah Deamron. In the affidavit, Agent Deamron averred that she was investigating the activities of Summit Contracting, Nate Smith, Chad Schampers, and John Solberg. She alleged that there was probable cause to believe that Smith, Schampers, Solberg, and others doing business as Summit have engaged in a fraud scheme committing acts of wire fraud and bank fraud. (Affidavit of Brian T. Fahl ("Fahl Aff.") ¶ 2, Ex. A, Search Warrant Aff. ¶ 5, Docket # 51-1.)

Specifically, Agent Deamron averred that on April 19, 2019, C.L. signed an agreement with Summit for improvements to C.L.'s roof and residence. (*Id.* ¶ 9.) C.L agreed to pay $62,968 to Summit and sought $65,000 in financing with GreenSky, Summit's preferred financing company at the time. (*Id.* ¶ 9–10.) However, due to C.L.'s bad credit, her application for financing was declined. (*Id.* ¶ 10.) Agent Deamron avers that C.L. was then advised by Summit to use her daughter's information to obtain the loan. (*Id.*) C.L.'s daughter also had bad credit, however, and that application was also declined. (*Id.*) Finally, C.L. was advised by a Summit employee to use C.L.'s elderly mother, F.M.'s, personal information and credit

history to obtain the loan. (*Id.*) The application in C.L.'s mother's name was approved for $65,000, although at that time, C.L.'s mother was confined to a nursing home approximately seventy-five miles away. (*Id.*)

Agent Deamron averred that she reviewed copies of business records kept by Summit, which showed that a loan of $65,000 was indeed approved in the name of F.M. using funding from Regions Bank of Alabama, an FDIC insured bank. (*Id.*) Agent Deamron further averred that she received Summit business records from Whistleblower #1, which showed that on April 23, 2019, employees of Summit Contracting withdrew $12,593.60 from C.L.'s GreenSky loan account. (*Id.* ¶ 11.) The documents further showed that two days later, on April 25, 2019, Summit Contracting employees withdrew $50,374 from C.L.'s loan account, leaving a balance of $0.40 in the account. (*Id.*)

Agent Deamron averred that she reviewed a GreenSky document entitled "Merchant Program Agreement" in effect in 2019 and included relevant parts of the agreement that she believed were violated by Summit's actions. (*Id.* ¶ 12.) Agent Deamron further averred that Whistleblower #1 reported that the incident with C.L. was not the only incident of fraud at Summit. (*Id.* ¶ 13.) Whistleblower #1 reports that while working for Summit, "constant calls were coming in non-stop and it was obvious this was fraud." (*Id.*) Whistleblower #1 further reported that customers complained that the entire amount of money was withdrawn from their accounts with GreenSky prior to the job being completed, or even started. (*Id.*)

The warrant was executed on June 26, 2019. The defendants assert that over 25,000 pages of documents were seized. (Defs.' Mem. in Supp. at 1.)

2.     *Evidentiary Hearing on Standing*

On January 9, 2023, I held an evidentiary hearing on the issue of standing. The following witnesses testified: Nathaniel Smith, Chad Schampers, Gina Schampers, and FBI Special Agent Brian D'Arcy.

### 2.1     Nathaniel Smith

Nathaniel Smith testified that on June 26, 2019, the day of the execution of the search warrant, he and Chad Schampers were the co-owners of Summit Contracting, a siding, roofing, and HVAC company. Smith testified that Summit Contracting had thirty to thirty-five employees of whom approximately twelve to fifteen worked at the Summit headquarters at 1703 West Matthew Drive. He testified that only he and Chad Schampers could unlock the building from the outside. Smith described the building that Summit occupied as consisting of 50 percent office space and 50 percent storage and workshop areas.

Smith testified that he was at the Summit building every day. During the weekdays, he would arrive at approximately 4:30 or 5:00 a.m. and work until 9:00 or 9:30 p.m. On the weekends, he worked from approximately 6:30 or 7:00 a.m. until 6:00 or 7:00 p.m. Smith testified that 90 percent of his workday was spent at the Summit office where he checked on jobs and the crew, met with vendors, checked on new products and materials, and other similar responsibilities.

Smith further testified regarding his involvement in customer job files. He testified that the customer job files were created by Gina Schampers. Gina would compile the hardcopy agreement, funding information, notes from the salesperson, and any specific information about products or service. Gina would then pass the file to Jessica, who would copy the contract and then pass the file to Smith. Smith would then distribute the contract to the

necessary unit such as roofing, HVAC, or windows. Jessica would then contact the customer to verify the agreement prior to ordering materials, after which the agreement would be stored in the locked records room.

Smith testified that he also had responsibilities as to the subcontractors. He looked over their accounting and made sure they got paid. However, Smith testified that he did not have responsibilities in the accounting realm.

Smith testified about the layout of the office and described in detail Exhibit 1 (diagram of the Summit premises). Smith testified as follows regarding the rooms that were searched. Smith testified that his office was searched and his cell phone, iPads, desktop computer, a bunch of documents, and his daughter's personal cell phone were seized. Of the 90 percent of his day spent at Summit, 50 to 60 percent of that time was spent in his office. His office was unlocked when he was there but was locked when he left the office.

Smith testified that the "Marketing Office" was where the employee who set up Summit's home and trade shows worked. He testified that this office was generally unlocked and that he went into that office once or twice a week.

Smith testified that that the "Window Office" is where the window technician or the window production manager worked. He testified that this office was unlocked. Smith testified that he accessed this office once or twice daily. Law enforcement did search this office and seized a desktop computer and an employee's personal laptop.

Smith testified that the "HVAC and Production" room, where the production manager worked, was also searched. Smith testified that the door to this office was generally open and that he would go into this office multiple times a day. A laptop computer and miscellaneous documents were seized from this office.

Smith testified that the "Accounting Office," where the accountant did the accounting, billing, and banking for Summit, was also searched. This office was locked when the accountant was not there. Smith would go into the accounting office three or four times a day. Smith testified that everything minus the desk and chair was seized from this office.

Smith testified the "HR Office," where the head of HR worked taking care of tasks such as insurance, new hire packets, subcontractor packets, and payroll, was searched. Employee files were stored in this office. The door to this office was locked when HR was not in the building. Smith went to that office two to three times a day. As with Accounting, everything except the furniture was seized.

Smith testified that the "Locked Record Room" was a room where all customer information on hard copy was kept. This room was locked all the time, and only Smith, Chad Schampers, Gina Schampers, and Shelly Mucha had access to this room. Smith went into this room probably four times a week. On the day of the execution of the search warrant, this room was unlocked because Smith and other Summit employees were putting files away in preparation for an open house. Everything in the file cabinet was seized.

Smith testified that his wife, Jessica, worked at the "Customer Care Office" and at the "Front Desk." His wife took care of customer contracts and contacted customers prior to the scheduling or start of a job. This office was generally locked but was unlocked during the day when people were working. Smith went into this office three to five times a day. This office was also searched, and everything was seized.

Smith testified that Gina Schampers' office was also searched. Gina uploaded hardcopy contracts into their Customer Relation Management software (CRM), and she did commissions for the jobs for the salesmen to be turned over to Chad Schampers or Smith for

approval. Whenever Gina was not in her office, her door would be locked. Smith went into Gina's office three to four times a day. Everything from Gina's office was seized.

Smith testified that Chad Schampers' office was searched. Chad Schampers handled front end operations, which consisted of scheduling appointments with new vendors, advertising, setting up meetings with marketing companies, and helping everywhere and anywhere that needed help. In his office, he kept IRS stuff, vendor paperwork, receipts, marketing receipts, and the like. Schampers' office was locked whenever he was not in his office. Smith was in Chad's office five to six times a day. Computers, cell phones, laptops, paperwork, documents, and Chad's personal safe were seized from his office.

Smith testified that the "Outgoing Phone Room" was the room where staff would call incoming leads. Approximately two to three employees worked in that room. Contacts for potential customers were kept in that room. Smith went in there once or twice a day. He believes customer information was seized from this room.

Smith testified that the "Computer Internet Router Room" was also searched and that all of the boxes and the servers were seized. He testified that this room was accessible from his storage area, which was kept locked. He went to this room once or twice per week.

Smith also testified that the "Training Room" was searched. However, he does not know if anything was taken from that room.

Finally, Smith testified that he would not expect that records would be taken from the Summit premises without his or Chad Schampers' consent.

On cross-examination, Smith testified that following the search, he observed damage to the keypad on Chad Schampers' door and damage to the lock on Gina's desk. There was no damage to the lock on the file cabinet. The day of the search warrant execution, an open

8

house was planned at the Summit office at which they were expecting 50 to 550 attendees. He further testified that in preparation of the open house, prior to the execution of the search warrant, they were in the process of closing up any documents that needed to be closed and securing any folders that needed to be secured.

Smith also testified that his computer was password protected and that he would have to enter a password every thirty minutes. Smith also testified that the CRM that they used was called Lead Perfection. All of Summit's employees had access to Lead Perfection, but employees were only allowed limited access depending on their role in the company. He testified that only he, Chad, and Gina had unfettered access to Lead Perfection.

### 2.2    Chad Schampers

Chad Schampers testified that on June 26, 2019, he and Smith were co-owners of Summit. On the day of the execution of the search warrant, Summit maintained no other offices. At the time, Summit averaged thirty to thirty-five employees, with ten to fifteen employees working in the office. He testified that like Smith, he was engaged daily with everyone in the office. He testified that he agreed with Smith's testimony regarding the layout of the office, which doors were locked, which rooms were searched, and which items were seized.

He further testified that he had a security keypad on his door and that only two or three people in the office (Nate Smith, his wife Gina Schampers, Adam, and maybe his mother Shelly) had the keypad code.

Regarding the "Locked Record Room," Schampers testified that he assumes that the room was unlocked prior to the execution of the warrant because they were packing up and getting ready for the grand opening. They were not planning on showing files to the guests at

the grand opening. Among the records that were kept in the file room were customers' applications for credit and credit card numbers, and other private information that they were responsible for keeping secure.

As to the computers at Summit, Schampers testified that he had a desktop computer that he used and that was password protected. He testified that the data from Summit computers was stored on the individual computers.

He testified that when working at the Summit office, he spent the majority of his time in his office and that most people would come to his office to talk to him. However, he would also frequently walk through the office and talk to others. There was also a meeting each morning attended by all employees.

Schampers testified that Summit did not frequently have visitors. Appointments were mostly done at customers' homes. He expected that the papers and files kept at Summit were private.

On cross-examination, Schampers testified that Summit Contracting provided login information for Lead Perfection to all employees, even to brand new employees on their first day of work. He testified that at one point in time, phone calls to Summit went directly to John Solberg and that he and Smith did not know what Solberg was doing. He further testified that the calls were directed to the call room, which Solberg headed. The call room was intended for calls from leads, not actual customers whose calls were handled by Customer Care. He testified that at some point in the process, the women at the front desk had access to all contracts.

Schampers also offered testimony as to his wife, Gina Schampers. He testified that Gina started working at Summit in April or May of 2019. At that time, they were already

married. Gina worked twenty-five to thirty-five hours per week. Gina had her own office to which he, Smith, and Gina had access. Her office was usually locked if she was not there. Gina's computer was password protected. Her duties included taking documents from customers to scan them, upload them, and build the customer files. She also handled paying commissions to the salespeople.

Schampers testified that some stock stuff and possibly contracts for some loans were in his personal safe that was seized from his office.

### 2.3     Gina Schampers

Gina Schampers testified that she started working at Summit in late February or March of 2019. She had her own key to her office. Gina did not think that anybody would have the ability or permission to take information or property from the Summit premises without her permission or the permission of one of the owners.

On cross-examination, Gina testified that she did not own any part of the business and that she was paid on an hourly basis. She also testified that tasks, such as submitting payments, that she performed were also performed by other employees. Finally, she testified that other employees also had access to Lead Perfection.

### 2.4     Special Agent Brian D'Arcy

Special Agent D'Arcy testified that he has been employed by the Federal Bureau of Investigations for approximately five years. He was involved in the execution of the search warrant at Summit as a photographer. He took pictures of the entry into the building after it was cleared, of where evidence was found, and exit pictures prior to law enforcement departing.

Agent D'Arcy testified that in preparation for testifying at the evidentiary hearing, he reviewed logs of evidence as well as the photographs taken during the search. He testified that the reports detailed each location from which evidence was taken. He testified that there were only a few times items that were taken from locked desk drawers.

When asked whether he was able to discern any "organizational principles," Agent D'Arcy testified that the main organizational principle was in the filing cabinet room, which appeared to store customer-related files. Otherwise, some of the offices or rooms appeared to have documents related to what might occur in that room. For example, in the call center, there were documents regarding leads.

He further testified that the majority of the evidence was found in the filing cabinet room. He testified that the filing cabinet was not locked and that there were office and cleaning supplies also in that room. He testified that the door to the room where the filing cabinet was located was not locked and was connected by an unlocked door to the common area. He further testified that there was no indication that the space was off limits to other employees or individuals.

Regarding Gina Schampers' office, Agent D'Arcy testified that she had a keypad on the door. He stated that the room with the filing cabinet had no such keypad. He testified that there were a number of documents on Gina's desk. He also testified that the computer was on with documents on the screen, even after the passage of time. He believed that this meant there was a not a locking screensaver on her computer, or if there was one, it took a very long time for it to kick in.

One of the photographs that he took showed that the computer screen was unlocked and open to information from Lead Perfection. Another photograph displayed a note that

was left on Gina's desk. He testified that he believed this note meant that people could come into Gina's office and leave notes on her desk.

Regarding Chad Schampers' office, Agent D'Arcy testified that at the time of the execution of the warrant, Schampers had documents on his desk. He also testified that there was a box of files in the corner of Schampers' office (Exhibit P15, box in corner). There was no indication in the report that officers had to unlock the door or that there was damage done to the door. He photographed no damage to the door. He testified that Schampers' interview with law enforcement during the execution of the search warrant was interrupted to ask for his desk keys as to not damage his desk. Items were also taken from a locked cabinet in Schampers' office. Other than the locked cabinet and locked desk drawers, everything else taken from Schampers' office was found in open or unlocked areas.

As to Nate Smith's office, Agent D'Arcy testified that his office door was open and unlocked. There were documents on the desk and the computer was on with documents open on the screen. He testified that photographs taken later during the search show that the documents, possibly a contract and a business email, were still open, even after the passage of time. As to the email, he testified that it appeared to display customer information. He testified that this indicated to him that either there was not a screensaver locking mechanism on Nate's computer or that it took a long time to kick in.

On cross-examination, Agent D'Arcy testified that he would have been the first person to enter the premises to take photographs. At the time, no employees were on the premises because they would have been directed to go to either the front area of the building or outside. He assumed that the employees were inside working prior to the arrival of law enforcement.

He agreed that this would explain why the computers were on with various documents on the screen.

Agent D'Arcy testified that he did not know if any members of the search warrant execution team changed any settings on the computers to prevent them from locking. He also did not know if the computers had been examined to determine how quickly they would timeout after a user logged in with a password. He did not recollect, and the paperwork did not suggest, that law enforcement asked Summit employees for keys to any doors or asked that any doors remain unlocked.

## ANALYSIS

1.  *Standing*

    1.1  Applicable Law

The Fourth Amendment protects citizens from unreasonable searches and seizures. To determine whether an unreasonable search occurred, a court must consider whether a trespass by law enforcement occurred, or whether an individual's reasonable expectation of privacy was violated by law enforcement. *United States v. Jones*, 565 U.S. 400, 408–409 (2012). While the government bears the burden of justifying a warrantless search, a defendant objecting to a search bears the burden of showing a legitimate expectation of privacy in the area searched. *United States v. Villegas*, 495 F.3d 761, 767 (7th Cir. 2007). A court assesses a defendant's legitimate expectation of privacy, or standing to object to a search, by considering "(1) whether the individual, by his conduct, has exhibited an actual (subjective) expectation of privacy; and (2) whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable." *United States v. Carlisle*, 614 F.3d 750, 756–57 (7th Cir. 2010). Demonstrating standing in the context of a corporate entity's premises is more difficult

because the expectation of privacy "is different from, and indeed less than, a similar expectation in an individual's home." *New York v. Burger*, 482 U.S. 691, 700 (1987).

In *Mancusi v. DeForte*, 392 U.S. 364, 369 (1968), the Supreme Court held that a union official had Fourth Amendment standing to challenge the government's search and seizure of documents from the office in which he worked. The office was a large room he shared with other union officials; it was not for his own exclusive use. *Id.* at 368. The official reasonably expected that no one would enter the office other than those with whom he shared the office or their invitees. *Id.* at 369. In other words, Mancusi had a reasonable expectation of privacy in his "personal office." *Id.* Moreover, he had standing to challenge the search and seizure even though he was not the owner of the premises, he shared the office with other union officials, and the documents seized were union documents rather than personal documents. *Id.*

But, in a commercial setting, what is the expectation of privacy beyond the personal or internal office at issue in *Mancusi*? I have not found, and the parties do not cite, any Supreme Court or Seventh Circuit cases on point. However, the parties both cite to two leading cases from the Ninth Circuit. In *United States v. Gonzalez*, 412 F.3d 1102, 1116 (9th Cir. 2005), the Ninth Circuit held that directors of a small, family-run corporation housing twenty-five employees at its peak had standing to challenge a wiretap in one of the company's buildings. The Court emphasized that: (1) the defendants exercised managerial control over the daily operations of the office where the conversations the wiretap seized took place; (2) they owned the building where the office was located; and (3) they could not only access the office, but they actually exercised full access to the building. *Id.* at 1117.

In *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 698 (9th Cir. 2009), the Ninth Circuit considered the Fourth Amendment standing of two controlling shareholders of a corporation. The defendants sought the suppression of search warrant evidence obtained from SDI's headquarters. *Id.* at 693. Both defendants maintained offices at the headquarters location. *Id.* at 694. The company was a moderate-sized company employing approximately forty to fifty employees at its corporate headquarters. *Id.* at 697. The district court found that both defendants had standing and suppressed the evidence; the Ninth Circuit reversed and remanded. *Id.* at 699.

In so doing, the Ninth Circuit explained that although the defendants had standing to challenge the admission of evidence from their personal internal offices, standing to challenge the remainder of the headquarters fell into a gap. *Id.* at 697. The Ninth Circuit resolved the issue by finding that except in the case of a small business over which an individual exercises daily management and control, an individual challenging a search of workplace areas beyond his own internal office must generally show some personal connection to the places searched and the materials seized. *Id.* at 698. The *SDI Future Health, Inc.* court further found that:

> [A]lthough all the circumstances remain relevant, we will specifically determine the strength of such personal connection with reference to the following factors: (1) whether the item seized is personal property or otherwise kept in a private place separate from other work-related material; (2) whether the defendant had custody or immediate control of the item when officers seized it; and (3) whether the defendant took precautions on his own behalf to secure the place searched or things seized from any interference without his authorization.

*Id.*

Other circuits' approaches are not dissimilar to the Ninth Circuit's. The Second Circuit has held that "[t]he question whether a corporate officer has a reasonable expectation of privacy to challenge a search of business premises focuses principally on whether he has made

a sufficient showing of a possessory or proprietary interest in the area searched." *United States v. Chang*, 897 F.2d 646, 649–50 (2d Cir. 1990) (citations omitted). This requires "a sufficient 'nexus between the area searched and [his own] work space'"—something that "necessarily must be determined on a case-by-case basis." *Id.* Both the Fifth and the Sixth Circuits have similarly found that individuals were not entitled to Fourth Amendment standing to contest searches of their businesses solely because of their status as owners or shareholders; more was required. *See, e.g.*, *United States v. Mohney*, 949 F.2d 1397, 1404 (6th Cir. 1991) (finding that the defendant did not have standing to contest the search of a corporation he owned because items uncovered were "documents he claimed to be completely uninvolved in preparing and which were kept in offices he claimed to rarely visit"); *Williams v. Kunze*, 806 F.2d 594, 600 (5th Cir. 1986) (finding that the vice president and president/sole shareholder had no reasonable expectation of privacy in corporate records kept in a "common file room").

### 1.2    Application to this Case

At the outset, it is worth pointing out that the question before the court is not whether Summit has standing to challenge the warrant and search. Rather, the question is whether the indicted defendants, not the corporate entity, have standing. In this case, items were seized from the defendants' internal or personal offices and from other offices and areas in the headquarters not occupied by the defendants. Each defendant, other than Jeffrey O'Brien[1], asserts standing to challenge the search of the entire Summit premises. Because Fourth Amendment rights are personal rights that may not be asserted vicariously, I will address each defendant's argument for standing in turn.

---

[1] Jeffery O'Brien offered no evidence at the evidentiary hearing and correctly concedes that he lacks standing to challenge the warrant and search.

I begin with the defendants' personal or internal offices. Chad Schampers, Nate Smith, and Gina Schampers each had an expectation of privacy in their personal offices. They each had offices that they did not share; each office had a door that could be locked when they were not present; each locked their doors when not in their offices. Accordingly, their standing to challenge the search of their personal office spaces falls squarely under *Mancusi*, even though the documents seized belong to the corporate entity. Recall that in *Mancusi*, the union official had standing to challenge the search of the office space where he worked despite the fact that he shared the office space with other union workers and the documents seized belonged to the union.

I am not persuaded that the fact the doors to their offices were opened during the search diminishes the defendants' expectation of privacy as to their personal offices. The warrant was executed in the morning of a workday. The employees were in their offices when law enforcement arrived, and as Agent D'Arcy testified, they were likely instructed by law enforcement to come toward the front of or outside of the building. Thus, the doors being opened does not indicate that their personal offices were not protected areas.

Similarly, I am not persuaded that the defendants having documents on their desks and on their computer screens at the time of the execution of the search warrant extinguishes their expectation of privacy in their offices. Again, it was a workday, and they were in the midst of working prior to the arrival of law enforcement. It appears that the documents on the desks and on the computers are more an indication of the time of day of the execution rather than the general accessibility of the desks and documents to the public. The defendants would not expect the general public to walk into their private offices and peer at their computer

Case 1:22-cr-00030-WCG     Filed 02/01/23     Page 18 of 30     Document 81

screens and rummage through their desks. The record shows that there was a reception desk to screen the occasional visitor.

In the same vein, when considering the totality of the evidence, I also do not find the government's argument about the security of the defendants' computers dispositive. The defendants testified that their computers were password protected. Agent D'Arcy testified that documents were visible on the computer screens when law enforcement first entered the premises and even after law enforcement had been on the premises for some time. (Exhibits P8, P9, and P11; Exhibits P21, P22, P23.) Agent D'Arcy opined that the state of the computers indicated to him that either there was not a screensaver locking mechanism on the computers or that it took a long time to kick in. While the government is correct that a defendant's effort to keep items private is a factor to consider when weighing whether their expectation of privacy is reasonable, the efforts at privacy must be evaluated in context. Here, again, the computers were inside the defendants' private internal offices, which were not open to the public and generally remained locked when not occupied.

Finally, much was made of the fact that an open house was scheduled for the same day that the warrant was executed. However, law enforcement did not arrive during the open house and find the internal office doors open and documents lying about such that the government could argue that the offices and documents were accessible to the guests or general public writ large. To the contrary, Smith testified that both he and Chad Schampers kept their personal offices locked/closed when they were not occupying them. They also testified that they were in the midst of preparing for the open house. Additionally, Summit did not see much customer traffic as they frequently went to their clients' homes and there was a reception desk to greet and screen the rare or occasional visitor. For these reasons, the

defendants have shown that they had a reasonable expectation of privacy in their personal or internal offices.

The more difficult question is whether the defendants have standing to challenge the search of areas beyond their personal internal offices. In this regard, the defendants argue that their case is like *Gonzales*, discussed above. The government, for its part, argues that this case is akin to *United States v. Britt,* 508 F.2d 1052, 1055 (5th Cir. 1975*).*

In *Britt*, the defendant, who was president but not the sole stockholder of a company, sought to suppress evidence seized at his corporate office. *Id.* The documents seized were normal corporate records not personally prepared by him, and the area searched was described as a storage area. *Id.* In holding that the defendant had no standing to challenge the search, the court noted that there was no evidence that Britt spent any of his time in the storage area or in other spaces on the business premises or that any of the materials seized were taken from his personal desk, briefcase, or files. *Id.* The court further noted that he had not been on the premises at the time of the searches and had not been on the premises for several months prior to the searches. *Id.* The court also noted that there was no indication on the record that the searches were directed at Britt as opposed to the activities of the corporation. *Id.* Under these facts, the court found that:

> When a man chooses to avail himself of the privilege of doing business as a corporation, even though he is its sole shareholder, he may not vicariously take on the privilege of the corporation under the Fourth Amendment; documents which he could have protected from seizure, if they had been his own, may be used against him, no matter how they were obtained from the corporation. Its wrongs are not his wrongs; its immunity is not his immunity.

*Id.* (citing *Lagow v. United States*, 159 F.2d 245, 246 (2d Cir. 1946), *cert. denied*, 331 U.S. 858 (1947)).

Here, Nate Smith and Chad Schampers are co-owners of Summit Contracting. The premises searched was Summit's headquarters. While Summit employed approximately thirty to thirty-five people, no more than twelve to fifteen employees regularly worked at the Summit premises. Smith and Schampers, in contrast, testified that Summit was treated as a second home. Smith testified that he spent the majority of his waking hours at Summit—working from approximately 4:30 or 5:00 a.m. until 9:00 or 9:30 p.m. on weekdays and from approximately 6:30 or 7:00 a.m. until 6:00 or 7:00 p.m. on weekends. Both men's wives and Schampers' mother all worked at Summit. Furthermore, both Smith and Schampers frequently brought their children to the Summit headquarters where the children had access to most of the premises and would play games, complete homework, and eat meals. Smith and Schampers also stored personal property, such as boats, RVs, and sporting equipment, at the premises both in their individual offices and in a storage area the two shared. Given that several of Smith's and Schampers' family members worked at the business, as well as the regular presence of their children on the premises, I credit the defendants' characterization of their business as a "family style and family run business."

Smith and Schampers further testified that beyond their titles as co-owners and the fact that they were at the business daily, they were the only two people with keys to the exterior of the building, keys to the interior offices, access to every room in the premises, and who could exercise control of the entire premises. Importantly, Smith testified that he had a part in the creation of the customer files, which were ultimately stored in the locked records room where the government asserts that most of the relevant information seized was found.

Thus, unlike in *Britt*, Smith and Schampers had a daily presence at the Summit office. Both were active in the daily goings on of the business, had daily contact with the areas

searched beyond their individual offices, and had a hand in the creation of the customer files. Additionally, unlike in *Britt* where the search was directed at the activities of the corporation and not the defendant, the investigation here targeted both Summit and the activities of Smith and Schampers. (Search Warrant Aff. ¶ 5) ("I am specifically investigating the activities of Summit Contracting, Inc., Nate Smith, Chad Schampers, and John Solberg . . . .).) On this record, Smith and Schampers have met their burden of demonstrating standing to challenge the search of the entire Summit premises.

However, unlike Smith and Schampers, Gina Schampers has not shown that she had an expectation of privacy in the areas beyond her immediate personal office. Gina's best argument for standing to challenge areas beyond her personal office is that she has a marital property interest in Summit as the wife of the co-owner Chad Schampers and that Schampers stored some marital property in his office safe and the storage room he shared with Smith. Gina does not cite to any authority, and I have found none, to support her marital property theory for standing. Such a theory for standing would have Fourth Amendment rights turn on the vagaries of state law, as not all states employ marital property rules. What is more, this argument runs afoul of the settled principle that standing cannot be shown vicariously. Thus, while Gina may challenge the search and seizure of items taken from her personal office, she lacks standing to challenge the search and seizure of items taken from areas of the Summit premises beyond her personal office.

### 2. *Motions to Suppress*

Defendants move to suppress all evidence obtained from the warrant to search the Summit Contracting premises for lack of probable cause. Further the defendants request a

hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), "to evaluate material omissions about witness credibility in the search warrant affidavit."

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. An affidavit for a search warrant establishes probable cause when it alleges facts sufficient to induce a reasonably prudent person to believe that a search of a particular place will uncover evidence of a crime. *United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2003). The Supreme Court has explained:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Illinois v. Gates*, 462 U.S. 213, 238 (1983). Though the affiant need not state each and every detail of the suspected crime, mere conclusory statements are insufficient. *See United States v. Reddrick*, 90 F.3d 1276, 1280 (7th Cir. 1996) (quoting *Gates*, 462 U.S. at 239) ("[A]n affidavit [of probable cause] must provide the magistrate with a substantial basis for determining the existence of probable cause, and [a] wholly conclusory statement . . . fails to meet this requirement.").

A defendant is entitled to a *Franks* hearing only if he makes a "'substantial preliminary showing' that: (1) the affidavit contained a materially false statement; (2) the affiant made the false statement intentionally, or with reckless disregard for the truth; and (3) the false statement was necessary to support the finding of probable cause." *United States v. Maro*, 272 F.3d 817, 821 (7th Cir. 2001) (quoting *Franks*, 438 U.S. at 155–56). This standard also applies when an affidavit is challenged on the ground that facts were omitted. *See, e.g., United States*

*v. Williams*, 737 F.2d 594, 604 (7th Cir. 1984). In other words, to be entitled to a *Franks* hearing based on omissions in a search warrant affidavit, the defendant must show that the omitted facts were material—"that is, if the fact[s] were included, the affidavit would not support a finding of probable cause." *Id.*

Furthermore, "*Franks* makes it clear that affidavits supporting a search warrant are presumed valid, and that the 'substantial preliminary showing' that must be made to entitle the defendant to an evidentiary hearing must focus on the state of mind of the warrant affiant," i.e., the law enforcement officer who sought the search warrant. *United States v. Jones,* 208 F.3d 603, 607 (7th Cir. 2000) (citing *Franks*, 438 U.S. at 171). The inquiry is "not whether the affidavit contains a false statement, but whether the affiant knew or should have known that a statement was false." *United States v. Schultz*, 586 F.3d 526, 531 (7th Cir. 2009) (citing *Jones*, 208 F.3d at 603). Consequently, "[t]he defendant must offer evidence showing either that the warrant affiant lied or that the warrant affiant recklessly disregarded the truth because he 'in fact entertained serious doubts as to the truth of his allegations' or had 'obvious reasons to doubt the veracity of the allegations.'" *Jones*, 208 F.3d at 607 (quoting *Williams*, 737 F.3d at 602). To meet this "substantial" burden, the defendant must make allegations, accompanied by an offer of proof, that are "more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171. Accordingly, "*Franks* hearings are rarely required." *United States v. Johnson*, 580 F.3d 666, 670 (7th Cir. 2009) (citing *Maro*, 272 F.3d at 821).

Defendants argue that a *Franks* hearing is warranted because Agent Deamron omitted critically important information regarding Whistleblower # 1's and C.L.'s credibility. (Defs.' Mem. in Supp., Docket # 52 at 17.) The probable cause in this warrant affidavit, however,

does not turn on Whistleblower # 1's statements, which are vague and non-specific. Rather, probable cause turns on the affiant's representations regarding C.L.'s interactions with Summit.

In her affidavit, dated June 25, 2019, Agent Deamron avers that on April 19, 2019, C.L. sought $65,000 in financing through GreenSky; however, due to bad credit, she was turned down. (Search Warrant Aff. ¶ 10.) Agent Deamron then avers that at "*the behest of a Summit Contracting, Inc. employee*, C.L. was advised to use her daughter's information to obtain the loan." (*Id.* (emphasis added).) When her daughter's poor credit was declined as well, Agent Deamron avers that "C.L. was advised by a Summit Contracting Inc. employee to use C.L.'s elderly mother, F.M.'s, personal information and credit history to obtain the loan." (*Id.*) Agent Deamron avers that the "loan taken out in C.L.'s mother, F.M.'s, name was approved for $65,000, though C.L.'s mother was at that time confined to a nursing home approximately 75 miles away." (*Id.*)

Taking Agent Deamron's statement at face value, it paints the picture of a Summit employee inciting C.L. to fraudulently use her daughter's personal information to secure financing through GreenSky, and when that was unsuccessful, advising C.L. to use her elderly mother's personal information. The affidavit further implies that given the fact F.M. was in a nursing home seventy-five miles away, she was none the wiser of this alleged arrangement. In other words, the search warrant affidavit tells the story of Summit inducing C.L. into lying to GreenSky by using her relatives' information without their permission to obtain financing and then stealing the money.

Recall that probable cause does not require the kind of evidence required at trial to prove guilt beyond a reasonable doubt. *Braun v. Baldwin*, 346 F.3d 761, 766 (7th Cir. 2003)

("Probable cause is not proof beyond a reasonable doubt, or even proof by a preponderance of evidence."). Probable cause requires only that a probability or a substantial chance of criminal activity exists. *Purvis v. Oest*, 614 F.3d 713, 722–23 (7th Cir. 2010). Thus, on the face of the affidavit, though it lacks the kind of exhaustive investigative chronology typical in search warrant affidavits seen in this district, and it could have been bolstered with more details of the who, what, and when of the alleged crime, it does allege that Summit and its employees probably committed bank and wire fraud.

But the story told in the affidavit is markedly different from the story C.L. told to Agent Deamron on June 25, 2019, the same day Agent Deamron applied for the search warrant. While C.L. opined that a Summit employee named Keenan tried to sell her on more work than she believed necessary, she otherwise does not accuse Keenan of any criminal wrongdoing. (Fahl Aff. ¶ 4, Ex. C, Docket # 51-3 at 2.) C.L. told Keenan that she had bad credit and was "tapped out" because of all the money she had put into the house, and she made it clear to Keenan that the work needed to be done cheaply and quickly so she could sell the house. (*Id.* at 3.) C.L. stated that Keenan raised the idea of having someone co-sign for the loan, and C.L. suggested her daughter. (*Id.*) C.L. called her daughter, who agreed to co-sign for the loan, but her daughter's credit was insufficient for approval. (*Id.*) Keenan then asked C.L. if she knew anyone else who could co-sign, to which C.L. suggested her mother. (*Id.*) C.L. then called her mother and asked if she would co-sign, and her mother agreed. (*Id.*) C.L. makes clear that her mother was only agreeing to co-sign, not take out the loan in her name alone. (*Id.*) Additionally, C.L. told Agent Deamron that both her and her mother were told by Keenan that her mother was a co-signer. (*Id.*) C.L. stated shortly after signing the Summit contract, her mother received paperwork in the mail from GreenSky showing $65,000

of financing prior to Summit even doing the work. (*Id.*) C.L. denied to Agent Deamron that either she or her mother signed any GreenSky paperwork. (*Id.*)

Despite C.L.'s statement to Agent Deamron that she did not sign any GreenSky paperwork, an April 19, 2019 document from GreenSky entitled "Borrower Application Acknowledgment and Payment Authorization Certificate" appears to contain both C.L.'s signature and initials authorizing the loan application. (Fahl Aff. ¶ 5, Ex. D, Docket # 51-4 at 10.) An additional GreenSky document, entitled "Loan Application Acknowledgment Form" also appears to contain C.L.'s signature, authorizing Summit to submit her loan application to GreenSky and agreeing that she "participated in the completion of the loan application and [has] received all disclosures associated with the loan application." (*Id.* at 11.) In addition to the GreenSky paperwork, a document on Summit's letterhead purportedly bearing the signatures of both C.L. and her mother, dated April 19, 2019, indicates that C.L. was the "applicant" and her mother was the "co-applicant." (*Id.* at 9.) However, on April 23, 2019, GreenSky apparently approved a loan in the amount of $65,000 for C.L.'s mother alone. (*Id.* at 12.)

At bottom, unlike the story in the affidavit, the story from the interview does not establish probable cause that Summit committed bank and wire fraud and that evidence of such criminality would be found on its premises. C.L. told Agent Deamron that when she told Keenan she had bad credit, he suggested she find someone to co-sign the loan. C.L. suggested first her daughter, then her mother, and called and obtained permission from both relatives to co-sign her loan. And the paperwork from both Summit and GreenSky indicates that on that same day, C.L. applied for financing with her mother as a co-signer. (Docket # 51-4 at 9.) Now, the record before the Court is unclear as to how and why the GreenSky

financing paperwork is in C.L.'s mother's name alone. But C.L. told Agent Deamron that she called *GreenSky* to complain about the error. (Docket # 51-3 at 3.) Finally, significant for the probable cause finding, the interview statement does not state that C.L. told Agent Deamron that Summit was the cause of GreenSky approving the financing in C.L.'s mother's name only.

Stated differently, the accurate insertion of C.L.'s interview statement is a version of events which, on its face, does not establish probable cause that Summit had committed bank and wire fraud. Agent Deamron, who interviewed C.L. on the same day she applied for the search warrant, either knew, or should have known, that the story written in the search warrant affidavit was inaccurate and materially different from the interview statement. Again, in the affidavit's version, the Summit employee is advising and encouraging C.L. to use other people's information to fraudulently obtain the loan. By contrast, in the interview version, the Summit employee merely raised the idea of co-signing, a very common and legal practice for obtaining loans. This is significantly different than putting a loan in someone else's name as the affidavit asserts. Furthermore, in the affidavit, these transactions are happening without the daughter's or mother's (who is confined to a nursing home seventy-five miles away) knowledge, while in the interview, C.L. explicitly calls and gets both her daughter's and mother's permission to use them as co-signers. And the paper evidence Agent Deamron had before her corroborated the co-signing version of the story, as there exists a Summit document showing C.L. as the applicant and her mother as the co-applicant, as well as GreenSky documents signed by C.L. agreeing that she was applying for the loan.

On this record, the defendants have made the substantial preliminary showing that a *Franks* hearing is warranted. The omissions are material. If C.L.'s interview statement was

accurately put into the search warrant affidavit, it would not support probable cause that Summit had engage in bank and wire fraud. Rather, it would merely show a Summit employee suggesting a person with bad credit find a co-signer, which the individual did with the co-signer's knowledge and permission. C.L. makes no allegation that it was Summit's doing that the GreenSky financing ended up in her mother's name only. And Agent Deamron either knew or should have known that the version of events recounted in the affidavit diametrically differs from the statement C.L. gave Agent Deamron the same day. For these reasons, the defense is entitled to a *Franks* hearing for the Court to determine whether Agent Deamron lied or recklessly disregarded the truth in drafting her search warrant affidavit.

## CONCLUSION

I find that defendants Nate Smith and Chad Schampers met their burdens to establish standing to challenge the search of both their respective individual offices and the entirety of the Summit premises and that Gina Schampers met her burden as to her individual office. Additionally, I find that the defendants have made the substantial preliminary showing to warrant a *Franks* hearing.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendants' motions requesting a *Franks* hearing (Docket # 49, 55, 57, and 62) are **GRANTED**. The Clerk's Office will contact the parties to schedule a *Franks* evidentiary hearing.

Your attention is directed to General L.R. 72(c), 28 U.S.C. § 636(b)(1)(B) and Federal Rules of Criminal Procedure 59(b), or Federal Rules of Civil Procedure 72(b) if applicable, whereby written objections to any recommendation or order herein, or part thereof, may be filed within fourteen days of the date of service of this recommendation or order. Objections

are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated at Milwaukee, Wisconsin this 1st day of February, 2023.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge